# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-45 (TNM)** |
| **JOSEPH PAVLIK** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Joseph Pavlik to 13 months' imprisonment, the midpoint of the stipulated Sentencing Guidelines range, 3 years of supervised release, a $100 special assessment, and $2,000 in restitution.

## I.     INTRODUCTION

The defendant, Joseph Pavlik, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is

Pavlik came to the Capitol prepared for violence, with a tactical vest, helmet, goggles, a gas mask, and a can of chemical spray. He led members of the Guardians of Freedom ("GoF"), an organization loosely affiliated with the Three Percenters,[2] to the Lower West Terrace. There, he was the first member of his squad of GoF members to push against the police line and into the Tunnel, which provides direct access to the Capitol Building. Pavlik, at the vanguard of the rioters in the Tunnel at that time, thrust his way forward despite police officers' desperate attempts to keep him and other rioters out of the Tunnel and away from the Capitol Building. The officers in the Tunnel were under siege for almost two and a half hours from Pavlik and others. After Pavlik pushed against officers in the Tunnel for about 10 minutes, police successfully expelled him. Nevertheless, he stayed at the Tunnel entrance and took out a canister of chemical spray that he had brought with him. Pavlik put his hand on the nozzle, but the crowd jostled him, and he fumbled the can before he could use it against officers. Undeterred, as he walked away from the Tunnel

---

also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[2] According to the website of the Anti-Defamation League:

> Three Percenters are part of the militia movement, which supports the idea of a small number of dedicated "patriots" protecting Americans from government tyranny, just as the patriots of the American Revolution protected early Americans from British tyranny. The Three Percenter concept, created in 2008, is based on an inaccurate historical claim that only three percent of Americans fought in the Revolutionary War against the British. Three Percenters may join or form traditional militia groups ut often form non-paramilitary groups or online networks. Many are not associated with any particular groups. The Three Percenter concept both contributed to and benefited from the resurgence of the militia movement that began in 2008.

https://www.adl.org/resources/backgrounder/three-percenters (visited June 22, 2023).

entrance, he passed a can of chemical spray back to the mouth of the Tunnel, where another rioter grabbed the can and used it on the officers there. Although other members of the GoF left the Tunnel area at around 4:30 p.m., Pavlik stayed until after 5 p.m., as the sun set and officers cleared the Lower West Terrace with tear gas.

The government recommends that the Court sentence Pavlik to 13 months' incarceration, which is the middle of the stipulated advisory Guidelines' range of 10-16 months. This recommended sentence reflects the gravity of Pavlik's conduct, but also acknowledges his admission of guilt.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021, Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 82, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.  Pavlik's Role in the January 6, 2021, Attack on the Capitol

#### *Facebook Statements Leading up to January 6*

Pavlik made violent and inflammatory statements on Facebook in the weeks leading up to January 6, including the following statements.

- Sent 11:13:44 p.m. EST on December 13, 2020 (commenting on a video showing a street

fight):

. These aren't Americans they are indoctrinated socialists that hate
America and hate Americans . We need to be much more brutal
than punching and kicking . This is not some simple street
disagreement .

- Sent 12:28:59 a.m. EST on December 14, 2020 (commenting on another video):

Put that miserable b lm bitch on the ground and grind her head
into the street

### *January 6, 2021*

On January 5, 2021, Pavlik rented a car and drove to Washington, D.C. While there, he stayed in a hotel with members of GoF.[3] On January 6, the group attended the former President's rally.

Before heading from the rally to the Capitol, Pavlik returned to his hotel and got his gas mask, which came with goggles, an extra pair of goggles, and a tactical vest and riot helmet. He also wore a black quilted jacket. The riot helmet he was wearing had a distinctive design that included a Velcro strip down the center of it and a patch on either side. *See* Images 1A and 1B, below.

---

[3] GoF was founded by Jeremy Liggett, Pavlik's nephew. *See* https://shorturl.at/hOSU6 at 20, Jeremy Liggett May 17, 2022 Deposition before January 6 Committee.

4

 

**Image 1A**                                                      **Image 1B**

**Image 1A: Pavlik (circled in yellow) leading other members of the GoF (circled in red) to the Lower West Terrace from the northwest lawn). Image 1B: Pavlik (circled in yellow) watching the chaos at the mouth of the Tunnel before he pushed his way inside. Co-defendant John Edward Crowley (circled in red) was a GoF member with Pavlik at the Tunnel.**

Pavlik and several other members of the group traveled on restricted grounds of the U.S. Capitol to the Tunnel.[4]

Pavlik arrived at the mouth of the Tunnel by 3:37 p.m. Between 3:37 p.m. and 4:00 p.m., Pavlik gave his extra pair of goggles to a police officer who did not have any eye protection but then quickly resumed his criminal activity. He entered the tunnel at approximately 4:00 p.m., where he "confront[ed] […] [and] actively pushed into officers as he tried to force his way further into the right side of the Tunnel." ECF 82, Statement of Offense, at 4. Images 2 and 3 below show

---

[4] According to the testimony of co-defendant John Edward Crowley at Crowley's trial, Pavlik "sometimes" led the way to the Tunnel.

Pavlik at the vanguard of rioters at the tunnel at 3:43 p.m. and 4:06 p.m. respectively. Image 3 is a screenshot from Exhibit 1, which shows Pavlik obstructing, impeding, and interfering with officers in the Tunnel. Ex. 1, 0:07-0:16.



**Image 2: Pavlik at the mouth of the Tunnel before he pushed inside.**



**Image 3: Pavlik (circled in red), noticeable from the Velcro stripe on his helmet, at the vanguard of rioters in the Tunnel. One officer attempted to remove Pavlik's hand from the riot shield while another officer tried to subdue Pavlik with spray. The mouth of the tunnel is just visible at the very top of the image. (Image 3 is a screen shot from Exhibit 1 at 0:14).**

After a 10-minute battle, officers expelled Pavlik from the tunnel at approximately 4:10 p.m. Instead of leaving the Capitol Grounds and returning to his hotel, Pavlik remained outside the Tunnel. At about 4:11p.m., he took a can of spray and put his hand on the nozzle to prepare to use it. Ex. 2, 0:12-0:23.



**Image 4  Pavlik (circled in red) at the mouth of the Tunnel as he gets ready to use the spray (highlighted in yellow) (zoomed-in screen shot from Exhibit 2 at 0:14).**

Before he could spray any officers, however, the mob jostled him, temporarily foiling his ability to spray the police. *Id*., 0:12-0:23. Then, Pavlik began to walk away from the mouth of the tunnel and the violence against officers taking place there. Ex. 2, 1:09-end. Prior to his departure, however, at approximately 4:12 p.m., he passed a can of chemical spray to the mouth of the Tunnel to another rioter, who grabbed it and blasted officers with spray multiple times. *Id*.

8



**Image 5: Pavlik (circled in red) passing the can of spray (highlighted in yellow) to the mouth of the tunnel before another rioter takes the handoff and deploys the spray against officers (zoomed-in screen shot from Exhibit 2 at 1:26).**

After passing the spray, Pavlik stayed near the Tunnel. He left the Lower West Terrace only after police used tear gas to clear the area after 5 p.m. Ex. 3, 0:02-0:08.



**Image 6: showing Pavlik leaving the Lower West Terrace (cropped screen shot from Exhibit 3 at 0:07)**

### *Pavlik's Conduct After January 6*

Following the riot, Pavlik posted statements on social media alternately whitewashing his actions, shifting blame, and encouraging insurrection. Specifically, on January 7, 2021, he said "we were peaceful protestors." On August 4, 2021, he called the investigation into what occurred on January 6 a "farce" and called members of Congress "filthy demon rats." On August 9, 2021, he falsely stated that "[t]here wasn't one person with a weapon [at the Capitol]," even though he himself had brought chemical spray on January 6.

On October 20, 2021, instead of sounding notes of contrition, Pavlik was encouraging insurrection and revolution when commenting on a user's Facebook post:

Joe Pavlik commented on C▮▮▮G▮▮▮▮s post. `It's past time . We need an insurrection or a revolution and it has to be so convincing that the left will never raise their head above ground again `

On April 24, 2022, he revealed that he viewed his and his follower rioters' conduct as the

mere ruffling of papers and tipping over of desks, commenting on another user's post:

Joe Pavlik commented on ████████P████'s post. `That is democrats definition of Peaceful protest . When papers were ruffled and desks tipped over in the Capitol that is an insurrection . Pathetic`

On April 26, 2022, Pavlik further showed a lack of remorse and complained that CNN had not "dug into federal involvement on Jan 06."

On August 23, 2022, a contact in Pavlik's phone messaged him asking if the FBI had visited Pavlik, further explaining that the FBI had visited a friend of a friend who was at the Capitol. Pavlik responded cheekily: "No I wasn't there 😄. "

*Pavlik's Interviews with the FBI*

FBI agents interviewed Pavlik on August 24, 2022, and October 18, 2022, He admitted to some of his conduct on January 6, 2021, at the U.S. Capitol. He told the FBI that Jeremy Liggett, his nephew and the founder of the GoF, invited him to the Capitol. Liggett had a hotel room full of brand-new tactical gear. On January 6, Pavlik borrowed a tactical vest and riot helmet. He also brought chemical spray and a gas mask, both of which he had already owned, with him to the Capitol. He admitted to entering and then leaving the Tunnel. He claimed that he ended up at the Tunnel by himself, though Image 1B above shows him with co-defendant Crowley at the Tunnel entrance.  Pavlik consented to a search of his home, his second home, and his phone. The gas mask Pavlik wore was recovered in his second home.

## III.    THE CHARGES AND PLEA AGREEMENT

On February 10, 2023, a federal grand jury returned a 12-count indictment charging Pavlik, Preller, and Crowley. Pavlik was charged  with  Civil Disorder, in violation of 18 U.S.C. § 231 (Count One); Entering and Remaining in a Restricted Building or Grounds with a Deadly or

Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(a) (Count Five); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(a) (Count Eight); Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(a) (Count Eleven); and Impeding Passage Through the Capitol Grounds or Buildings, in violation of 40 U.S.C. §5104(e)(2)(G) (Count Twelve), all related to his activities in a restricted area while in possession of a deadly and dangerous weapon, specifically, the chemical spray.

On August 25, 2023, Pavlik pled guilty to Civil Disorder, in violation of 18 U.S.C. § 231, and Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(a), pursuant to a plea agreement.[5]

## IV.    STATUTORY PENALTIES

Pavlik now faces sentencing on 18 U.S.C. § 231(a)(3), civil disorder, and 18 U.S.C. § 1752(a)(1) and (b)(1)(a), entering and remaining in a restricted building or grounds with a deadly or dangerous weapon. As noted the plea agreement and the Presentence Report issued by the U.S. Probation Office, Pavlik faces up to five years' imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, and a mandatory special assessment of $100 on the Civil Disorder count. On the Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon count, Pavlik faces up to ten years' imprisonment, a term of

---

[5] Preller pled guilty to Count One of the Indictment, charging him with a violation of 18 U.S.C. § 231(a)(3). On September 13, 2023, this Court sentenced Preller to 60 months' probation, including 8 months' location monitoring, and the remaining charges were dismissed. Crowley was convicted of violations of 18 U.S.C. §§ 231(a)(1), and 1752(a)(1) and (a)(2), and 40 U.S.C. §5104(e)(2)(E) after a bench trial. Sentencing is scheduled for January 19, 2024.

supervised release of not more than three years, a fine of up to $250,000, and a mandatory special assessment of $100.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The U.S. Probation Office calculated Pavlik's criminal history as category I, which is not disputed. PSR ¶ 50. Accordingly, based on the government's calculation of Pavlik's total adjusted offense level, after acceptance of responsibility, at 12, Pavlik's Guidelines imprisonment range is 10 to 16 months' imprisonment. Pavlik's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

### A.      U.S.S.G. §4C1.1 IS NOT APPLICABLE TO THIS CASE.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. §4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

Section 4C1.1 does not apply in this case because Pavlik personally used violence and the threat of violence in connection with the offenses, and he possessed a dangerous weapon in connection with the offense. *See* U.S.S.G. §4C1.1(a)(4) and (7) (stating that acts of violence and possession of a dangerous weapon disqualify potential candidates from attaining the §4C1.1 adjustment). Here, Pavlik pushed against officers in the Tunnel, prepared himself to spray officers, and handed a can of chemical spray to another a rioter, who used it to spray officers in the Tunnel. These are clear acts of violence. The government is aware of at least three cases in which courts

13

have rejected the application of §4C1.1 to January 6 defendants who engaged in violence. *See United States v. Gundersen*, 21-cr-137 (RC); *United States v. Baquero*, 21-cr-702 (JEB); *United States Dillard,* 23-cr-49 (JMC). Furthermore, a can of chemical spray is "capable of inflicting […] serious bodily injury." U.S.S.G. §1B1.1 cmt. n.1; *see also* U.S.S.G. §4C1.1(b)(1) (stating that dangerous weapon has the meaning given to that term "in the Commentary to §1B1.1").

The Court should not apply §4C1.1 here for the further reason that the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").

Moreover, the Sentencing Commission enacted §4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol

attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court finds that §4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply §4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether §4C1.1 applies.[6]

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

---

[6] U.S.S.G. §5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. §5C1.1, comment. n. 10. The government submits that for the same reasons that §4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to §5C1.1.

A.      **Nature and Circumstances of the Offense**

As shown in Section II(B) of this memorandum, Pavlik's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Pavlik forced his way to the Lower West Terrace and confronted and pushed against police officers who were attempting to hold off rioters in the Tunnel and prevent a further breach of the Capitol. Furthermore, he aided an assault of officers with chemical spray. Specifically, Pavlik handed a can of spray to a rioter at the mouth of the Tunnel, where Pavlik had just seen rioters violently fighting police. The rioter then blasted police officers with chemical spray.

The most important factors to be considered in Pavlik's case are: (1) his preparation for violence at the Capitol on January 6 as shown by the fact that he wore tactical gear and brought a dangerous weapon; (2) he sometimes led the way for members of the GoF to the Tunnel, according to the testimony of his co-defendant, Crowley; (3) he pushed against police officers in the Tunnel for about 10 minutes and then remained near the tunnel until police forced him to leave about 1.5 hours after his arrival at the Tunnel; and (4) he readied himself to use chemical spray and when he failed to deploy the spray, he handed off a can of spray that another rioter used against police. Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

B.  **Pavlik's History and Characteristics**

Pavlik does not have a prior criminal history. He is 66 years old and had a relatively normal middle-class upbringing in Chicago. PSR ¶ 55.  Pavlik served as a firefighter for 33 years before

retiring in 2013. PSR ¶ 81. Pavlik also volunteered at Ground Zero after 9/11. PSR ¶ 66. Nonetheless, on January 6 he fanned the flames of the mob by leading a group of men in tactical gear to the Tunnel, where he joined in pushing against the police line and helping to spray police.

Pavlik spoke with the FBI and consented to searches of his homes and phone.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Pavlik's criminal conduct on January 6 was the epitome of disrespect for the law. Pavlik and members of his group came prepared for violence at the Capitol on January 6, 2021. He carried and helped use chemical spray against officers; he tried to force his way past officers who were defending the Tunnel and the Capitol from further breaches. He pushed against officers in the Tunnel before being expelled and he did not leave the area of the Tunnel until officers used tear gas there. His social media and messages were unrepentant and violent. Pavlik did, however, provide and extra set of goggles to an officer who did not have them. For that reason, even though his assaultive conduct arguably calls for a high-end guidelines sentence, the government is recommending a sentence at the midpoint of the guidelines range.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[7] The demands of general

---

[7] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a significant term of incarceration. As indicated above, his statements before and after January 6 show a lack of remorse and a penchant for violence that reveal a real need for specific deterrence.

### E.        The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.        Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range,

19

differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9]

Although the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The facts of Pavlik's case are similar to those in *United States v. Zachary Johnson*, 22-CR-11 (RJL), where the defendant pushed against officers in the Tunnel and then handed a can of

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022, Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

spray to another rioter closer to the Tunnel who then used the spray on police, ECF 146, Statement of Offense at 2-3. Johnson pled guilty to 18 U.S.C. § 111(a)(1). 22-CR-11, ECF 145 at 1. His sentencing is pending, but the parties in that case agreed that Johnson's Estimated Offense Level is at least 21. *Id.* at 3. In this matter, if Pavlik's Offense Level was 21, he would be looking at 37-46 months imprisonment. Due to Pavlik's pleading to a lesser charge, his partial acceptance of responsibility, and his providing another officer with goggles, a smaller sentence is apposite here. Additionally, Johnson was accused of carrying a sledgehammer along with OC spray, so a lesser punishment is appropriate for Pavlik. 22-CR-11, ECF 54 at 3 and 5.

Moises Romero, 21-CR-677 (TSC), attended the rally then proceeded to the Capitol building. Similar to Pavlik, Romero wore goggles and a respirator while on the restricted Capitol grounds. Several police lines were breached by the time Romero arrived, and he proceeded to the stairs under the Northwest scaffolding, then went to the West Terrace. Romero took advantage of other rioters' efforts to breach the police line on the West Terrace, then headed to the Lower West Terrace where officers still maintained control of a police line. Romero and other rioters joined forces to push through the line. Soon thereafter, Romero and other rioters tried to push their way through a temporary barrier erected by police officers inside the Senate Wing Door. Officers used riot shields to fend off the rioters. Like Pavlik, Romero grabbed a riot shield while an officer was actively using it to protect himself and a breach of the point of entry. Romero and others eventually broke through the police line and entered the Capitol. After pleading guilty to a single count of felony Civil Disorder, Romero was sentenced to 8 months' imprisonment. Pavlik's conduct was worse than Romero's because Pavlik helped assault officers with spray.

In *United States v. Preller,* 23-cr-45, this Court sentenced co-defendant Preller to 60

months' probation, including 8 months of location monitoring. Like Pavlik, Preller was a member of GoF who went to the Capitol attired in tactical gear. Like Pavlik, Preller entered the Tunnel and carried a can of spray. However, unlike Pavlik, Preller apparently made no effort to use the spray, nor did he give it to anyone else. Unlike Pavlik, who faces sentencing for convictions of 18 U.S.C. 231(a)(3) and 18 U.S.C. 1752(a)(1), (b)(1)(A), Preller faced sentencing on a single count of violating Section 231(a)(3). At the sentencing hearing, this Court stated in sum and substance that if Preller had used the weapons he had carried on January 6, he would be facing years in prison. Preller did not use his weapons that day. Unlike Preller, Pavlik did make use of his weapon. First, Pavlik appeared to get ready to use the chemical spray himself, but the jostling of the mob prevented him from doing so. Second, as Pavlik was leaving the Tunnel entrance, Pavlik handed off his spray to another rioter, who used it against police. (During the trial of co-defendant Crowley, this Court heard testimony from Officer Henry Foulds, who was in the Tunnel with Pavlik, and who testified that that there was so much spray in the Tunnel that he (Officer Foulds) had to be hospitalized just from touching his bare skin after he left Tunnel. It was Pavlik's conduct, in passing spray to another rioter, that contributed to the harm to officers holding the line against rioters and protecting the people inside the Capitol.) When someone hands a triggerman a gun, he bears culpability for the shooting. That principle clearly applies here, and although the Government does not seek years of imprisonment, the seriousness of the conduct does require a significant sentence of incarceration. Accordingly, Pavlik warrants a much lengthier sentence than that imposed on Preller.

Like Pavlik and Preller, Jonathan Rockholt is a member of GOF who traveled to Washington, D.C. and ultimately forced his way to the Tunnel and confronted police officers. He

pleaded guilty to violating 18 U.S.C. §§ 231 and 641. *United States v. Rockholt*, 23-CR-104 (TNM). Like Pavlik, Rockholt faced a guideline range of 10 to 16 months' imprisonment. This Court sentenced Rockholt to 5 months' incarceration; however, Rockholt's conduct was less serious than Pavlik's conduct because unlike Pavlik, Rockholt did not bring a dangerous or deadly weapon, and he did not pass that weapon (a spray cannister) to another rioter, thereby enabling the other rioter to assault police with the spray.  Moreover, unlike Pavlik, Rockholt was not at the forefront of the line of rioters in the tunnel. Accordingly, a lengthier sentence is warranted for Pavlik, as his conduct was more serious.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[10] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," and any offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Pavlik must pay $2,000 in restitution, which reflects in part the role Pavlik played in the riot on January 6.[11] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol caused approximately $2.8 million in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of October 2022. *Id.* As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD. Pavlik's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 115.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 13 months' incarceration, 3 years supervised release, and restitution of $2,000.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: /s/ *Joshua Ontell*
Joshua Ontell, VA Bar No. 92444
Assistant United States Attorney

---

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

U.S. Attorney's Office for the District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7706
joshua.ontell@usdoj.gov